**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| ALESHA NICOLE BEAL, | CASE NO. 4:25-CV-00647 |
| Plaintiff, | |
| | JUDGE BENITA Y. PEARSON |
| vs. | |
| | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Alesha Nicole Beal seeks judicial review of the final decision of Defendant Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.      Procedural History

Ms. Beal filed her DIB and SSI applications on February 2, 2023, alleging disability beginning August 4, 2022.  (Tr. 17, 67, 75, 185.)  She alleged disability due to: neck injury, status-post neck surgery, long COVID, high blood pressure, headaches, and psoriasis.  (Tr. 68, 76, 83, 91, 107, 112, 115, 223.)  Her applications were denied at the initial level (Tr. 17, 103-07) and upon reconsideration (Tr. 17, 110-15).  She then requested a hearing.  (Tr. 116-17.)

1

On January 4, 2024, an online video hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 17, 29-62.)  The ALJ issued an unfavorable decision on March 6, 2024, finding Ms. Beal had not been under a disability from August 4, 2022, through the date of the decision.  (Tr. 14-28.)  Plaintiff requested review of the decision by the Appeals Council.  (Tr. 179-81.)  The Appeals Council denied her request for review on February 4, 2025, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  Plaintiff filed the pending appeal on April 2, 2025 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 7, 9, 11).

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Ms. Beal was born in 1979.  (Tr. 31, 185.)  At the time of the hearing, she lived with her 9-year-old son.  (Tr. 35.)  She had past work as a personnel scheduler, office manager, and dental assistant / medical secretary.  (Tr. 37-41, 56-57.)  She stopped working in August 2022 due to her health conditions.  (Tr. 37, 223.)

### B.  Medical Evidence

#### 1.  Relevant Treatment History

On April 8, 2022, Ms. Beal presented to Megan A. Demos, APRN, FNP-BC, at Family Health Physical Medicine for an examination of bilateral low back and hip pain which she said had been ongoing for almost a year.  (Tr. 496.)  She reported a history of chronic neck pain since 2013 when she had disc replacement surgery following an injury at work.  (*Id*.)  She rated her low back and hip pain a 7/10 and her neck pain a 4/10.  (*Id*.)  She reported having headaches on most days, which she attributed to her job.  (*Id*.)  Her diagnoses included: low back pain, unspecified; bilateral hip pain; cervicalgia; thoracic spine pain; and headache, unspecified.  (Tr. 497.)  APRN Demos ordered spine and hip x-rays, referred Ms. Beal to a chiropractor and

physical therapy, prescribed trigger point injections for the cervical, thoracic, and lumbar spinal musculature (two injections per week for four weeks), and prescribed a cervical positioning pillow for home use.  (*Id*.)  Ms. Beal attended physical therapy and chiropractic appointments at Family Health Physical Medicine through at least June 2022.  (Tr. 498-512.)

On August 5, 2022, Ms. Beal presented to Christine Cannell, APRN, CNP, at Alliance Family Health Center for headaches and body aches.  (Tr. 400-03.)  Ms. Beal felt that her headaches were related to being back at a job where she was using a computer and were triggered by anxiety.  (Tr. 400, 404.)  Her headache-related symptoms included: dizziness, memory impairment, and nausea.  (Tr. 400.)  Her body had been aching for the past five days with no fever or chills, and she reported joint pain and swelling.  (*Id*.)  On examination, her insight was poor and her short-term memory was mildly impaired.  (Tr. 402.)  Physical examination findings were unremarkable, with no abnormalities in Ms. Beal's neck examination.  (*Id*.)  Ms. Beal's diagnoses included unspecified headache and pain in unspecified joints.  (*Id*.)  APRN Cannell prescribed Nurtec and ordered lab work for Ms. Beal's headaches.  (*Id*.)

On September 28, 2022, Ms. Beal presented to Mark R. Grubb, M.D., at the Northeast Ohio Spine Center.  (Tr. 328-29.)  She complained of neck pain with headaches and upper extremity numbness and pain with tingling and weakness.  (Tr. 328.)  Her symptoms had worsened over the prior six months, and were aggravated when she looked up and down or side to side; they improved if she changed positions and with medication.  (*Id*.)  Her medications included Zanaflex, Tylenol, and Aleve.  (*Id*.)  On physical examination, Ms. Beal had a normal gait, heel and toe walked without difficulty, and had full range of motion in her shoulders without pain, but there was mild tenderness to palpation along the cervical spine and diminished range of motion in her neck; Spurling's maneuver caused neck and arm symptoms; motor testing

was abnormal with evidence of a low extension weakness for elbow flexion, wrist extension, elbow extension, finger flexion, finger abduction, hip flexion, knee extension, ankle dorsiflexion, long toe extension, and ankle plantarflexion; reflexes were hypoactive for triceps, brachioradialis, biceps, knee jerk and ankle jerk; and she exhibited diminished sensation in both hands.  (*Id*.)  Cervical spine x-rays taken earlier in September 2022 showed a prior cervical fusion at the C4-5 and C5-6 levels was intact, but there were mild to moderate degenerative changes observed at the C3-4 and C6-7 levels, worse at C6-7.  (Tr. 328, 517-18.)  Ms. Beal was diagnosed with adjacent level disease and status post ACDF 2013, and cervical spinal stenosis. (Tr. 329.)  Dr. Grubb recommended an MRI to evaluate areas of cervical spine stenosis, nonoperative care, and symptomatic measures, such as physical therapy.  (*Id*.)

On October 10, 2022, Ms. Beal returned to Dr. Grubb to discuss the results of her MRI. (Tr. 327.)  She continued to complain of neck pain with headaches and upper extremity numbness and tingling.  (*Id*.)  On examination, her gait was normal, and motor testing was intact, but her neck range of motion remained diminished and Spurling's maneuver caused neck pain. (*Id*.)  Dr. Grubb reviewed Ms. Beal's October 6, 2022 MRI, noting that it showed her prior fusion at the C4-5 and C5-6 levels, progression of degenerative changes at C3-C4 and C6-C7 with mild stenosis at both levels, and some facet degenerative changes.  (Tr. 327, 330-31.)  Ms. Beal was diagnosed with cervical spondylosis and adjacent level disease and status post previous ACDF 2013.  (Tr. 327.)  Dr. Grubb did not recommend surgical intervention.  (*Id*.)  Instead, he recommended aggressive nonoperative care that included physical therapy and proper pain management, with alternative modalities to help with the pain such as compounding cream, injections, or acupuncture.  (*Id*.)  He referred her to a pain management specialist.  (*Id*.)  He also

indicated Ms. Beal could benefit from cervical facet blocks, and would likely be a candidate for radiofrequency ablation if that was effective. (*Id.*)

On October 19, 2022, Ms. Beal presented to David Esparaz, M.D., at Integrative Pain Care, LLC regarding her neck pain, muscle aches, and arthralgias / joint pain. (Tr. 363-66.) She reported bilateral neck pain that was stabbing, burning, aching, deep, and radiating to her thumbs. (Tr. 364.) Her physical examination revealed severe tenderness to palpation over the cervical spine and hyperalgesia along the C5, C6, C7 dermatomes. (Tr. 365.) Spurling's was negative but there was considerable guarding and reduced range of motion. (*Id.*) Her deep tendon reflexes were depressed but symmetrical in her bilateral biceps, triceps, and brachioradialis with no clonus, fasciculations, muscle atrophy, or spasm. (*Id.*) Dr. Esparaz indicated that Ms. Beal's examination showed grossly preserved strength and sensation with no red flag symptoms. (*Id.*) He diagnosed cervical radiculopathy, cervical post-laminectomy syndrome, and multiple level cervical spondylosis without myelopathy. (Tr. 365-66.) Ms. Beal agreed to proceed with bilateral steroid injections at C5 and C6. (*Id.*)

On November 7, 2022, Ms. Beal presented to Adam J. Hedaya, M.D., at Integrative Pain Care, LLC for follow up after receiving steroid injections. (Tr. 355-59.) She reported 100% relief temporarily and two more injections were recommended. (Tr. 357.) Dr. Hedaya also started Ms. Beal on Cymbalta. (*Id.*)

On December 13, 2022, Ms. Beal returned to Dr. Esparaz for follow up (Tr. 342-45) after completing a full series of steroid injections (Tr. 344). She had "90% relief and ongoing," and she reported "better sensations in [her] hands which [was] a drastic change from prior." (*Id.*) Her examination noted tenderness to palpation over the cervical spine. (*Id.*) Spurling's was negative, but there was considerable guarding and reduced range of motion. (*Id.*) There was

mild hyperalgesia along the C5, C6, C7 dermatomes.  (*Id*.)  She ambulated normally.  (*Id*.)  Her strength and sensation were grossly preserved.  (*Id*.)  She continued to take duloxetine (Cymbalta) with relief.  (*Id*.)  Dr. Esparaz prescribed a trial of cyclobenzaprine as needed for occasional muscle spasms.  (*Id*.)

When Ms. Beal returned to Dr. Hedaya on January 10, 2023 (Tr. 337-40), it was noted that she responded to the steroid injections in terms of her radicular pain (Tr. 339).  Her examination noted severe tenderness to palpation over the cervical spine and depressed deep tendon reflexes in the bilateral upper extremities.  (*Id*.)  Spurling's was negative but there was considerable guarding and reduced range of motion.  (*Id*.)  Ms. Beal's strength and sensation and coordination were intact, she had a normal gait and station, and there was no muscle atrophy or spasm.  (*Id*.)  Dr. Hedaya discussed the possible benefit of radio frequency ablation and cervical medial branch blocks, but noted that Ms. Beal was dealing with hypertension and swelling and had an echo and EKG pending.  (*Id*.)  Her diagnoses included cervical radiculopathy, cervical post-laminectomy syndrome, multiple level cervical spondylosis without myelopathy, retrolisthesis, spinal stenosis in cervical region, cervico-occipital neuralgia, cervical spondylosis, and cervicogenic headache.  (Tr. 340.)

On February 13, 2023, Ms. Beal presented to Yu Han Lee, M.D., at Alliance Family Health Center to discuss the results of her echo.  (Tr. 372-76.)  No issues were noted in her echo, but she continued to have shortness of breath that was worse since COVID.  (Tr. 372.)  She reported fatigue, malaise, dizziness, headaches, and neck pain.  (Tr. 373-74.)  Her physical examination was normal.  (Tr. 374-75.)  She was diagnosed with hypertension, cervicalgia, and dyspnea.  (Tr. 375.)  Dr. Lee noted that her blood pressure was improved but increased her medication to control her blood pressure.  (*Id*.)  Dr. Lee advised Ms. Beal to follow closely with

pain management regarding her cervicalgia.  (*Id.*)  Given her persistent dyspnea symptoms worsening with exertion, Dr. Lee referred her to pulmonology for evaluation of post COVID symptoms.  (*Id.*)

On March 15, 2023, Ms. Beal returned to Dr. Esparaz for follow up.  (Tr. 426-29.) Examination findings were similar to those at her January 2023 appointment with Dr. Hedaya. (*Compare* Tr. 428 *with* Tr. 339.)  It was noted that Ms. Beal had responded to the injections in terms of her radicular pain and had 75% relief with respect to her axial neck pain following her first set of medial branch blocks.  (Tr. 428.)  Dr. Esparaz continued Ms. Beal's prescriptions for Cymbalta and muscle relaxants.  (Tr. 428-29.)

When Ms. Beal returned to Dr. Esparaz on April 26, 2023 (Tr. 420-24), her examination findings were similar to those at her March 2023 appointment (*compare* Tr. 422-23 *with* Tr. 428).  Dr. Esparaz noted that Ms. Beal's headaches were prominent, and he felt she would benefit from a referral to a neurologist for her headaches.  (Tr. 423.)  Ms. Beal also reported abdominal and low back pain.  (*Id.*)  She was seeing a gastroenterologist for her abdominal pain and Dr. Esparaz recommended imaging of her low back.  (*Id.*)  Dr. Esparaz noted that Ms. Beal's dermatologist requested a break in steroid exposure because her psoriasis had flared up.  (*Id.*)

A May 19, 2023 lumbar spine MRI showed mild disc bulging at L3 – L4 that created mild left neural foraminal narrowing, and a lumbar spine x-ray showed mild osteoarthritis.  (707-09.)  On May 25, 2023, Ms. Beal returned to Dr. Esparaz.  (Tr. 702-06.)  Her examination findings were similar to those at her April 2023 appointment.  (*Compare* Tr. 704-05 *with* Tr. 422-23.)  Because he felt that Ms. Beal's pain was consistent with the MRI he reviewed, Dr. Esparaz recommended proceeding with bilateral injections at L3 and L4.  (Tr. 705, 707-08.)  On June 7, 2023, Ms. Beal received bilateral lumbar nerve root blocks at L3 and L4.  (Tr. 711-13.)

Seven months later, on December 11, 2023, Ms. Beal presented to John P. McCallin, M.D., at University Hospitals Portage Medical Center for an initial evaluation regarding her neck and low back pain.  (Tr. 725.)  She explained she was previously treated at Integrative Pain Management but could not continue treating there because she lost her job and changed insurance providers.  (*Id*.)  She said her pain was worse when transitioning from sitting to standing and her pain was relieved with Cymbalta and Flexeril.  (*Id*.)  But she had not been able to take her usual dose of Cymbalta due to changing her insurance.  (*Id*.)  She reported anterior and posterior hip pain with no radiating pain, numbness, or tingling.  (*Id*.)  She said injections had provided minor relief and did not believe they were "worth going through."  (*Id*.)  On examination, Ms. Beal's balance, gait, and stance were unremarkable.  (Tr. 727.)  There was tenderness to palpation over her cervical and lumbar spine with positive Faber, Gaenslen's, and sacral compression tests bilaterally.  (*Id*.)  However, her strength was grossly 5 out of 5 throughout the bilateral extremities, light touch sensation was intact in the cervical spine, straight leg raise was negative bilaterally, her gait was non-antalgic, she could heel and toe walk without difficulty, and Spurling's and facet loading maneuvers were negative.  (*Id*.)  Dr. McCallin noted that Ms. Beal's history and examination were significant for bilateral sacroiliitis, that she had failed conservative treatment, which included physical therapy, and that she had continued to perform her home exercises.  (Tr. 728.)  Ms. Beal was diagnosed with sacroiliitis, myofascial pain, and cervical post-laminectomy syndrome.  (*Id*.)  Dr. McCallin increased Ms. Beal's Cymbalta dose, planned to administer sacroiliac joint injections, and encouraged Ms. Beal to continue her home exercises.  (*Id*.)

### 2.      Opinion Evidence

On March 24, 2023, state agency medical consultant Karen Schnute, M.D., reviewed the record and completed a physical RFC assessment.  (Tr. 69-72.)  Dr. Schnute considered evidence regarding Ms. Beal's reported headaches and noted her functioning was limited by headaches and body aches but did not find her headaches to be a severe impairment.  (Tr. 69-72.)  Dr. Schnute opined that Ms. Beal could: occasionally lift, carry, push, and pull 20 pounds; frequently lift, carry, push, and pull 10 pounds; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday; frequently climb ramps/stairs; occasionally climb ladders/ropes/scaffolds and crawl; frequently reach overhead bilaterally; and should avoid hazardous machinery.  (Tr. 71-72.)

Upon reconsideration, on June 2, 2023, state agency medical consultant Abraham Mikalov, M.D., affirmed Dr. Schnute's findings.  (Tr. 84-87.)

### C.      Plaintiff's Function Report

On February 22, 2023, Ms. Beal completed a Function Report.  (Tr. 233-40.)  She stated that her headaches, body aches (neck), inability to sit or stand for extended periods, and increased neck pain with computer work limited her ability to work.  (Tr. 233.)  She took a lot of breaks when caring for her 8-year-old son and performing household chores because her medications made her extremely tired.  (Tr. 234, 235.)  She had to find a new home for their dog due to her inability to continue to care for the dog.  (*Id.*)  Her family and boyfriend helped with cooking, cleaning, yard work, and driving.  (*Id.*)  She was able to take care of her personal care but noted that there was added pain associated with doing so.  (Tr. 234.)

Ms. Beal reported that she could drive and go out alone.  (Tr. 236.)  She estimated shopping in stores once a week for one to two hours.  (*Id.*)  Her hobbies included reading, riding

bikes, hiking, and fishing, but she was not able to hike or ride her bike at that time.  (Tr. 237.)
She spent time with others in person, on the phone, and via text and got together for game nights
every other week.  (*Id*.)  Otherwise, she said she did not have any regular social commitments
due to her pain level.  (*Id*.)  She could go on a short walk around the block but had to rest for
about five minutes before starting to walk again.  (Tr. 238.)  She needed frequent breaks when
working on the computer or doing paperwork.  (*Id*.)

**D.      Hearing Testimony**

**1.      Plaintiff's Testimony**

Ms. Beal testified in response to questioning by the ALJ and her counsel at the hearing on
January 4, 2024.  (Tr. 35-56.)  She lived in a house with her 9-year-old son.  (Tr. 35.)  She had a
driver's license, but she said there were days she did not drive due to headaches, pain, or her
neck "acting up too bad."  (Tr. 36.)  On a typical day when her neck pain and headaches were not
too bad, she said she was able to get her son to school and drive her son and herself places.  (Tr.
36-37.)  When she could not get her son to or from school because her neck was "too bad," she
had help from others. (Tr. 36.)

Ms. Beal reported that her "biggest impediment" to working was her neck pain.  (Tr. 41.)
Her neck pain varied in intensity, but it was always present.  (Tr. 44.)  She said lifting items and
having her arms in "any consistent position[]," especially if raised around or above shoulder
height, aggravated her neck pain and caused extremity pain along with weakness and tingling.
(Tr. 44-45.)  When she was working and using a computer all day, she had to change positions,
stretch, move, and stand because sitting with her hands on her desk too long caused radiating
pain and stiffness in her neck.  (Tr. 45.)  She described the radiation that she felt as "a burning
sensation in [her] fingers and then [her] entire arm from shoulder to down [would] get numbness

and tingling." (*Id.*)  She estimated she could maintain one static position for 10 to 15 minutes before she would start to have pain in her hands.  (*Id.*)  She could probably lift a gallon of milk, but she had her son lift heavier items, like cases of water or other drinks.  (Tr. 45-46.)  She could perform tasks with her hands like buttoning and zipping, but had to adapt in some ways, like mostly having slip-on shoes because of difficulty bending over and tying shoes.  (Tr. 47-48.)  She had started to do a lot of things with her left hand because the pain was worse in her right arm and hand.  (Tr. 48.)  She could still write with her right hand, but she had to take a break after 10 to 15 minutes.  (Tr. 48-49.)  She said it was difficult for her to lift and reach overhead because doing so caused her to lose sensation in her hands.  (Tr. 55.)  She tried to avoid using her right hand to put dishes away because she often dropped things due to numbness.  (*Id.*)

Ms. Beal reported having problems with her low back on and off for a few years; the problems were more consistent over the prior year.  (Tr. 49.)  Her low back pain affected her on most days but there were some days that it did not.  (Tr. 50.)  Her low back pain was aggravated by lifting, sitting too long, standing too long, or being in static positions for too long.  (*Id.*)  She could sit for about 20 minutes and estimated she could stand longer, for about 45 minutes, because she could "keep . . . constant movement going."  (Tr. 50-51.)

Ms. Beal reported constant headaches that varied in severity.  (Tr. 51.)  She rated the severity of her headaches on a regular basis as a 4 or 5 out 10, with 10 requiring an emergency room visit.  (Tr. 52.)  She said once or twice a week she would get a more severe headache that made her nauseous and she would have to lie down in the dark for a while.  (*Id.*)  With respect to the more severe headaches, she said they would typically subside within a couple of hours if she could lie down and use some heat and ice therapy.  (*Id.*)  No matter the severity of her headaches,

she said they affected her ability to concentrate and focus.  (*Id*.)  When her neck pain started to get intense, that would bring on a headache.  (Tr. 52-53.)

As far as treatment for her neck problems, she had surgery in 2013.  (Tr. 42.)  She last tried formal physical therapy at or around the time that she stopped working.  (*Id*.)  While she was not involved in formal physical therapy, she said she continued to do stretching exercises that were sent home with her by physical therapy.  (*Id*.)  She also tried injections.  (*Id*.)  She said the injections provided "short lived" relief, which she described as maybe a week.  (Tr. 41-42.)  She was prescribed Cymbalta and Flexeril; Cymbalta was supposed to help with her chronic pain, but she did not feel it worked well for her.  (Tr. 42-43.)  The Flexeril helped her sleep for more consecutive hours at a time, but she still typically woke up after four or five hours of sleep and needed an ice pack or heating pad or needed to move around to alleviate some of her symptoms.  (Tr. 43.)  After doing that, she would fall back asleep for about two more hours.  (Tr. 43-44.)  She recently met with a new pain management provider regarding her low back pain, and she said they were waiting on imaging to determine a course of treatment.  (Tr. 49.)  She received one injection through her prior pain management provider for her low back, but it was not helpful; then her insurance changed and she did not have any more injections.  (Tr. 49-50.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 55-61.)  The VE classified Ms. Beal's past relevant work as follows: personnel scheduler, a sedentary, semi-skilled job; office manager, a sedentary, skilled job; and composite job of dental assistant, a light, skilled job performed by Ms. Beal at the medium level, and medical secretary, a sedentary, skilled job performed by Ms. Beal at the medium level.  (Tr. 56-57.)  In response to the ALJ's first hypothetical, the VE testified that a hypothetical individual of Ms. Beal's age, education, and

12

work experience, and with the functional limitations described in the ALJ's RFC determination, including frequent reaching overhead and no more than frequent handling, fingering, or feeling with the right upper extremity (Tr. 21), could perform Ms. Beal's past work as a scheduler and office manager as classified by the DOT and as actually performed by Ms. Beal, and Ms. Beal's past work as dental assistant / medical secretary as classified by the DOT, but not as actually performed by Ms. Beal (Tr. 57-58).

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; § 416.920[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work in the national economy.  *Id.*

## IV.     The ALJ's Decision

In his March 6, 2024 decision, the ALJ made the following findings:[2]

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2027.  (Tr. 20.)

2.      The claimant has not engaged in substantial gainful activity since August 4, 2022, the alleged onset date.  (*Id*.)

3.      The claimant had the following severe impairments: cervical spondylosis, radiculopathy and post-laminectomy syndrome, and lumbosacral radiculopathy.  (*Id*.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 20-21.)

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can never climb ladders, ropes, or scaffolds; she can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; she can frequently reach overhead; she can frequently handle, finger, and feel with the upper right extremity; she must avoid concentrated exposure to hazards such as unprotected heights and dangerous moving machinery.  (Tr. 21-23.)

6.      The claimant is capable of performing past relevant work as a personnel scheduler and office manager as the work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.  (Tr. 23-24.)

Based on the foregoing, the ALJ found Ms. Beal was not under a disability from August 4, 2022, through the date of the decision.  (Tr. 24.)

## V.      Plaintiff's Arguments

Ms. Beal presents three arguments on appeal.  (ECF Doc. 7, pp. 1, 7-19; ECF Doc. 11.) First, she argues the ALJ erred and failed to adhere to SSR 96-8p because he did not consider all of her impairments, and specifically failed to consider the effects of her headaches in combination with her other impairments and symptoms when formulating the RFC.  (ECF Doc. 7, pp. 1, 7-10; ECF Doc. 11, pp. 1-2.)  Second, she argues the ALJ failed to comply with SSR 16-3p when evaluating her subjective symptom reports.  (ECF Doc. 7, pp. 10-16.)  Third, she argues the ALJ erred at Step Four when he concluded that she could perform her past work at the light exertional level.  (*Id*. at pp. 16-18.)

## VI.      Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

16

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     First Assignment of Error: The ALJ Adequately Considered the Effects of Plaintiff's Spine Impairments, Including Headaches, in Formulating the RFC**

In her first assignment of error, Ms. Beal argues that the ALJ failed to consider the totality of her impairments as required by SSR 96-8p because he "failed to consider any effects related to the combination of Plaintiff's spine impairments with related headaches, numbness, ting[l]ing, and weakness." (ECF Doc. 7, pp. 1, 7-10.) The Commissioner argues in response that the ALJ "considered all of Plaintiff's impairments in crafting the RFC and specifically discussed Plaintiff's headaches multiple times later in the decision."[3] (ECF Doc. 9, pp. 5-7.)

Social Security Ruling 96-8p provides that "[t]he RFC assessment must be based on *all* of the relevant evidence in the case record," explaining further:

> In assessing [the] RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.

SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34477 (July 2, 1996) (emphasis in original). The Sixth Circuit also recognizes that an ALJ must consider "the combined effect of all of the claimant's impairments without regard to whether any

---

[3] The Commissioner also argues that the ALJ properly found Plaintiff's headaches were not a severe impairment. (ECF Doc. 9, pp. 5-7.) But Plaintiff does not argue that her headaches should have been deemed severe, instead saying "it was believed that Plaintiff's headaches were related to her cervical spine issues" and describing Plaintiff's headaches as one of several "effects related to the combination of Plaintiff's spine impairments." (ECF Doc. 7, p. 9.) Because Plaintiff does not clearly state a Step Two argument in her brief, that argument is not addressed herein.

such impairment, if considered separately, would be of sufficient severity to render the claimant disabled." *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1071 (6th Cir. 1992).

In support of her argument that the ALJ failed to "consider any effects related to the combination of [her] spine impairments with related headaches, numbness, tingling, and weakness," Ms. Beal restates, word-for-word, her earlier summary of the evidence (*compare* ECF Doc. 7, pp. 7-9 *with id.* at pp. 2-3) with one added paragraph identifying certain medical records that document her complaints of headaches and/or extremity weakness or numbness (*id.* at p. 8 (citing Tr. 369, 383, 388, 397, 416)).

A review of the ALJ's written decision reveals that he considered numerous records relating to Ms. Beal's headaches, extremity weakness, and numbness in connection with her spinal impairments. At Step Two, he found "cervical spondylosis, radiculopathy and post-laminectomy syndrome" and "lumbosacral radiculopathy" to be severe impairments, specifying that those impairments significantly limited Plaintiff's ability to perform basic work activities. (Tr. 20.) At Step Three, he discussed Plaintiff's severe impairments as follows:

> The claimant had lumbar and cervical spine pain with paresthesia and decreased sensation and reflexes at times. However, she exhibited generally normal strength. Additionally, evidence did not demonstrate nerve root or cauda equina compromise. Moreover, the claimant did not require an ambulatory aid. Furthermore, while she had upper extremity pain and numbness, the evidence did not show that she was unable to use her upper extremities for activities involving fine and gross movements. Rather, she performed various daily tasks without noted difficulty, including handling her personal care, cleaning, and doing laundry (6E/4).

(*Id.* (emphasis added).) At Step Four, the ALJ acknowledged Plaintiff's subjective complaints of "daily headaches, body aches, and neck pain" and "problems using her right hand for manipulative tasks," but found those complaints were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 21.) The ALJ then summarized the treatment records, specifically acknowledging and discussing: Plaintiff's remote history of cervical

18

surgery; her ongoing medical treatment for headaches, neck and back pain, extremity weakness, and diminished sensation, including related clinical findings; and her responses to treatment. (Tr. 22-23.)  He specifically referenced: an August 2022 "exam for headaches"; a September 2022 "exam for neck pain radiating to the upper extremities with numbness and weakness, in addition to headaches"; and cervical spine injections resulting in "improvement in her pain and sensation."  (Tr. 22.)  The ALJ also discussed the opinions of the state agency medical consultants—who opined that Plaintiff could perform light work with limited overhead reaching—and found the opinions persuasive, but concluded that Plaintiff's "ongoing spinal pain and radiculopathy necessitated further postural and manipulative limitations."  (Tr. 23.)  The ALJ then added an RFC limitation to frequently handling, fingering, and feeling with the right upper extremity.  (Tr. 21.)  Following this discussion, the ALJ explained:

> With respect to the claimant's alleged symptoms and limitations, the undersigned finds such assertions only partially consistent with the evidence. <u>She had ongoing neck and back pain going into her upper extremities with numbness and tingling at times. However, with treatment, she had some improvement of her symptoms. While the claimant reported ongoing pain and she had depressed reflexes, more recent exams showed generally normal strength, sensation, gait, and coordination.</u> Such facts suggest that the claimant could perform the reduced range of light work described in the residual functional capacity.
>
> In sum, the above residual functional capacity assessment is supported by the objective medical evidence of record and the opinions of the individuals that have had the opportunity to review the claimant's records and examine the claimant. Furthermore, the undersigned does not find that the claimant's symptoms are so severe as to prohibit her from performing all basic work activities. The residual functional capacity set forth above addresses the claimant's symptoms to the degree supported by the evidence as a whole.

(Tr. 23 (emphasis added).)

Although Plaintiff summarizes evidence that she believes supports her arguments, she does not specifically identify material evidence that the ALJ either misrepresented or failed to address.  (*See* ECF Doc. 7, pp. 7-9.)  The ALJ was not required to discuss all of the evidence, but

only to consider the evidence as a whole and reach a reasoned conclusion. *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)). Having reviewed by the underlying evidence and the ALJ's written decision, the undersigned concludes that the ALJ's detailed analysis was sufficient to support a finding that he both considered the evidence as a whole and reached a reasoned conclusion. In particular, he considered the effects of Plaintiff's spinal impairments (including headaches and numbness or weakness in her extremities) and adequately articulated how he factored those effects into the RFC. Ms. Beal certainly has not shown that the ALJ's findings lacked the support of substantial evidence. *See Blakley*, 581 F.3d at 406 ("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

For the reasons set forth above, the undersigned concludes that Ms. Beal has not met her burden to show that the ALJ failed to comply with SSR 96-8p or to build a logical bridge between the evidence and the result when he evaluated the effects of Plaintiff's spinal impairments, or that the ALJ's RFC findings at Step Four lacked the support of substantial evidence. Accordingly, the undersigned finds the first assignment of error is without merit.

**C.     Second Assignment of Error: The ALJ Appropriately Evaluated Plaintiff's Pain**

In her second assignment or error, Ms. Beal argues that the ALJ did not articulate a supportable rationale for discounting her subjective reports of pain under SSR 16-3p and failed to support his conclusions with substantial evidence. (ECF Doc. 7, pp. 10-16.) In response, the Commissioner argues that the ALJ properly evaluated Ms. Beal's subjective complaints of pain and made findings that were supported by substantial evidence. (ECF Doc. 9, pp. 7-10.)

### 1.    Legal Standard for Evaluation of Subjective Symptoms

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).  Under the two-step process to assess the limiting effects of a claimant's symptoms, the first determination is whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers*, 486 F.3d at 247.

In undertaking the second step analysis, an ALJ should consider the objective medical evidence, the claimant's subjective complaints, information about the claimant's prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. § 404.1529(c)(3).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3).  An ALJ need not discuss all regulatory factors he considers, only those he finds pertinent to the case.  SSR 16-3p, 82 Fed. Reg. 49462, 49467.

2.        **The ALJ Appropriately Evaluated Plaintiff's Subjective Complaints**

Ms. Beal argues that the ALJ erred in analyzing her subjective complaints because the "records documented [her] pain related symptoms" and her "pain issues . . . interfered with her ability to sustain activities," including "her ability to sustain concentration and movement." (ECF Doc. 7, pp. 13-14.)  In support, she generally summarizes her hearing testimony and function report before providing a word-for-word restatement of the evidentiary summary for her first assignment of error.  (*Compare* ECF Doc. 7, pp. 12-13 *with id.* at pp. 7-9; *see also id.* at pp. 2-3.)  The Commissioner argues in response that the ALJ appropriately considered the medical and non-medical evidence relevant to Plaintiff's complaints of pain.  (ECF Doc. 9, pp. 7-10.)

Here, as discussed in Section VI.B., *supra*, the ALJ acknowledged Plaintiff's complaints of "daily headaches, body aches, and neck pain" that allegedly impacted her ability to sit, stand, lift, bend, sit, kneel, and climb, that led her to change positions regularly, and that allegedly caused "difficulty concentrating and completing tasks," but found Plaintiff's allegations were "not entirely consistent with the medical evidence and other evidence in the record[.]"  (Tr. 21.)

Consistent with SSR 16-3p, the ALJ considered the medical evidence relating to Ms. Beal's medically determinable impairments, including her diagnoses, examination findings, prescribed treatments, and responses to treatment.  (Tr. 22-23.)  Specifically, he observed: that Ms. Beal repeatedly complained of neck and back pain, headaches, and numbness and tingling in her upper extremities; that some physical examinations noted abnormal findings; but that her physical exams also noted normal gait, sensation, and coordination, with no muscle atrophy or spasms.  (*Id.*)  The ALJ observed that Ms. Beal sometimes reported improvement in her pain and sensation with cervical injections, but at other times reported that she did not feel injections provided adequate relief to justify the procedures.  (Tr. 22.)  He considered precipitating and aggravating factors, noting that Ms. Beal said moving her neck exacerbated her symptoms and

that her pain was worse with transitioning from sitting to standing.  (*Id.*)  Also consistent with SSR 16-3p, the ALJ considered Ms. Beal's reported daily activities, including her reported ability to perform daily tasks such as managing her personal care, cleaning, and doing laundry without noted difficulty.  (Tr. 20.)  The ALJ also considered the opinions of the state agency medical consultants, who opined that Ms. Beal could perform a reduced range of light work.  (Tr. 23.)  He found the opinions persuasive, explaining that "the record generally confirmed that the claimant could perform light work," but also concluded that Ms. Beal's "ongoing spinal pain and radiculopathy necessitated further postural and manipulative limitations."  (*Id.*)

After discussing Ms. Beal's reported symptoms, daily activities, and the medical records at length, the ALJ explained his findings as to Ms. Beal's subjective symptoms as follows:

> With respect to the claimant's alleged symptoms and limitations, the undersigned finds such assertions only partially consistent with the evidence. She had ongoing neck and back pain going into her upper extremities with numbness and tingling at times. However, with treatment, she had some improvement of her symptoms. While the claimant reported ongoing pain and she had depressed reflexes, more recent exams showed generally normal strength, sensation, gait, and coordination. Such facts suggest that the claimant could perform the reduced range of light work described in the residual functional capacity.

(Tr. 23 (emphasis added).)  The ALJ explained further:

> In sum, the above residual functional capacity assessment is supported by the objective medical evidence of record and the opinions of the individuals that have had the opportunity to review the claimant's records and examine the claimant. Furthermore, the undersigned does not find that the claimant's symptoms are so severe as to prohibit her from performing all basic work activities. The residual functional capacity set forth above addresses the claimant's symptoms to the degree supported by the evidence as a whole.

(*Id.* (emphasis added).)

The ALJ thus considered the factors set forth in SSR 16-3p, provided "specific reasons for the weight given to the individual's symptoms," and made findings that were "consistent with and supported by the evidence."  SSR 16-3p, 82 Fed. Reg. 49462, 49467.  Specifically, the ALJ

considered Ms. Beal's subjective reports of pain, her treatment with medication and injections, the effects of that treatment, her abnormal and normal examination findings, her continued ability to perform activities of daily living, and the opinions of the state agency medical consultants, before concluding that her impairments supported a light RFC with additional limitations in posture, climbing, reaching, handling, fingering, and feeling and reduced exposure to hazards.  (Tr. 20-23.) Plaintiff has not met her burden to show these findings lack the support of substantial evidence.

As discussed in Section VI.B., *supra*, the question before this Court is not whether there is evidence in the record to support Ms. Beal's preferred findings.  Even if a preponderance of the evidence supports a finding that Ms. Beal's subjective complaints are credible, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.

For the reasons set forth above, the undersigned concludes that the ALJ appropriately addressed Ms. Beal's subjective complaints regarding her pain in accordance with the regulatory requirements articulated in SSR 16-3p, that the ALJ's findings were supported by substantial evidence, and that Ms. Beal has not met her burden to demonstrate otherwise.  Accordingly, the undersigned finds the second assignment of error is without merit.

**D.      Third Assignment of Error: The ALJ Did Not Err in Finding Plaintiff Could Perform Her Past Work at Step Four**

In her third assignment of error, Ms. Beal argues that the ALJ erred when he found at Step Four that she could perform her past relevant work as a personnel scheduler and an office manager.  (ECF Doc. 7, pp. 16-18.)  First, she argues that her work as an office manager was performed too long ago to qualify as past relevant work under new Social Security Ruling 24-2p. (*Id.* at pp. 16-17.)  Second, she argues that neither past job could be performed if the RFC were modified to permit only occasional use of her upper extremities.  (*Id.* at pp. 17-18.)  The

Commissioner responds that the first argument lacks merit because Plaintiff performed work as an office manager as recently as May 2019, less than five years before the ALJ decision.  (ECF Doc. 9, pp. 10-11.)  And as to the second argument, the Commissioner asserts that Plaintiff is actually asserting another challenge to the RFC, rather than a challenge to the ALJ's findings regarding Plaintiff's past relevant work.  (*Id.* at p. 11.)

Social Security Ruling ("SSR") 24-2p, adopted in June 2024, revises the Social Security Administration's definition of "past relevant work" to include only work "done within the past 5 years."  SSR 24-2p, *How We Evaluate Past Relevant Work*, 89 Fed. Reg. 48479, 48480 (June 6, 2024).  Citing to SSR 24-2p, Plaintiff argues that the ALJ erred in finding that she could perform her past work as an office manager, which she performed between May 2013 and May 2019.  (ECF Doc. 7, pp. 16-17 (citing Tr. 23).)  But the Commissioner correctly observes that the ALJ issued his decision in March 2024 (Tr. 24), and Ms. Beal was still working as an office manager five years before that date, in March 2019.  (ECF Doc. 9, pp. 10-11.)  The undersigned further observes that SSR 24-2p only applies to new applications filed on or after June 22, 2024, and claims pending on or after June 22, 2024.  *See* 89 Fed. Reg. 48479, n. 1.  Since Ms. Beal's claim was adjudicated on March 6, 2024, and therefore was not still pending on June 22, 2024, the terms of SSR 24-2p do not apply in this case.  For the stated reasons, Plaintiff's argument that the ALJ erred in finding her job as an office manager qualified as "past relevant work" must fail.

In support of her second argument, Ms. Beal highlights the VE's testimony that all of Plaintiff's past work is eliminated if the RFC limits her to occasional handling, fingering, and feeling bilaterally.  (ECF Doc. 7, p. 18 (citing Tr. 58).)  She then cites some of the same records discussed in connection with her first two assignments of error—her subjective complaints of headaches and upper extremity weakness, numbness, pain, and tingling, her cervical MRI

findings, and some of her treatment for pain—and argues generally that "[c]ontrary to the ALJ's RFC that Plaintiff could frequently use her upper extremities, the evidence as set forth above established that she had greater limitations based on objective testing (Spurling's) and MRI along with her presentation during her examinations with all providers." (*Id.*)

As the Commissioner contends, this is not so much an argument regarding Plaintiff's past work as one more challenge to the ALJ's RFC findings at Step Four. For the reasons set forth in Sections VI.B and VI.C., *supra*, the undersigned concludes that Ms. Beal has not met her burden to show that the ALJ's RFC findings at Step Four lacked the support of substantial evidence.

For the reasons set forth above, the undersigned concludes that the ALJ did not err in finding Ms. Beal could perform her past relevant work as a personnel scheduler and an office manager, and Ms. Beal has not met her burden to demonstrate otherwise. Accordingly, the undersigned finds the third assignment of error is without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.


February 6, 2026


/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).